**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

Kevin Minley, #203987

    Plaintiff,

v.

Pierce, et al.

    Defendants.

Case No: 2:19-cv-00153
District Judge: Paul L. Maloney
Magistrate Judge: Maarten Vermaat

| MICHIGAN STATE UNIVERSITY COLLEGE OF LAW | CHAPMAN LAW GROUP |
|---|---|
| Daniel Manville (P39731) | Wedad Suleiman (P81970) |
| Attorney for Plaintiff | Attorney for Defendant Corizon Health, Inc.; Keith Papendick, M.D.; and Patricia Schmidt, D.O. |
| 610 Abbot Rd. | 1441 West Long Lake Rd., Suite 310 |
| East Lansing, MI 48823 | Troy, MI 48098 |
| (517) 432-6866 | (248) 644-6326 |
| daniel.manville@law.msu.com | wsuleiman@chapmanlawgroup.com |

**EXHIBIT G TO DEFENDANTS CORIZON HEALTH, INC., KEITH PAPENDICK, M.D., AND PATRICIA SCHMIDT, D.O.'S MOTION FOR SUMMARY JUDGMENT**

[

**SONORAN DESERT VISION CONSULTING**
Todd A. Lefkowitz, MD, FAAO
DIPLOMATE, AMERICAN BOARD OF OPHTHALMOLOGY

# MINLEY EXPERT WITNESS REPORT

I, Todd A Lefkowitz, MD, am a licensed physician certified by the American Board of Ophthalmology. I am a physician licensed to practice Medicine in all of its branches in Arizona, New York and Idaho in the Unites States of America. I currently practice in the area of Medicine applicable in this case. I am familiar with the standard of care for medical practice that currently relates to issues of care and treatment of patients such as Kevin Minley. I am familiar with the standard of care in this case by virtue of my training, education and experience of 40 years in the same field or related healthcare fields as the physicians who treated Kevin Minley. I can fairly evaluate the quality of care that was provided to Kevin Minley. Attached is a copy of my curriculum vitae.

I have practiced Ophthalmology in the USA since 1981. I graduated from New York University School of Medicine in 1977, and did my Ophthalmology residency at Georgetown University (1978-1981). I was certified by the American Board of Ophthalmology in 1982. I am a practicing physician and surgeon, and perform LASIK, cataract and other types of eye surgery.

I am a medical expert witness in Ophthalmology, and have worked as such in many different jurisdictions in the USA. I was a physician member of the Arizona Medical Board from 2007-2010, and reviewed Ophthalmology cases for the Board for 7 years prior to that.

RECORDS REVIEWED:

1. Records from Michigan Department of Corrections
2. Records from Grand Traverse Ophthalmology

CHRONOLOGY OF EVENTS:

7/7/16: Patient seen at Michigan Department of Corrections (MDOC) medical facility;

8/15/16: Patient seen at GTOC on recommendation from Department of Corrections; diagnosis is made of primary open angle glaucoma in both eyes and that pressure control is adequate on latanoprost/ dorzolamide/ timolol / and brimonidine

1/16/17: Glaucoma check; intraocular pressure (IOP); IOP 13 both eyes; on Cosopt, Brominidine and Xalatan drops

4/16/17: IOP 13 both eyes; visual fields and OCT scheduled for July

7/7/17: visual fields unreliable, OCT of optic nerve unchanged

11/27/17: Patient followed at Michigan Department of Corrections clinic

1/3/18: Patient seen at GTOC

1/11/18: MDOC: IOP stable, OCT stable

7/10/18: MDOC: Dr. is recommending cataract surgery on the right eye with possible glaucoma surgery as well

7/13/18: Dr. Papendick does not feel that the indications are present for cataract surgery

9/6/18: MDOC:  patient on brimonidine Cosopt and Xalatan drops

10/3/18: Patient seen at GTOC; SLT surgery not recommended but recommend cataract surgery in the right eye

10/15/18:  MDOC: cortical cataracts may interfere with vision

1/15/19: Patient is seen at GTOC for cataract evaluation; visual acuity in the right eye is 20/30 -1 in the left eye 22 ; slit lamp exam shows 2+ cortical changes in the right and 1+ cortical changes in the left; cataract surgery of the right eye is recommended and this could possibly be combined with minimally invasive glaucoma surgery

1/18/19:  MDOC: SLT recommended

DISCUSSION:

Cataracts cause varying degrees of visual loss. The main indication for cataract surgery is when a person's visual function no longer meets his or her needs and cataract extraction will provide improved vision. This level of visual impairment is subjective and differs considerably among individuals. Nevertheless, insurance carriers typically choose 20/40 Snellen visual acuity as the threshold for cataract surgery, since this level of sight is required for driving. However, visual acuity can be quite variable depending upon the testing conditions, test distance, and type of cataract. Therefore it may be difficult to appreciate the impact of a cataract on the patient's vision especially when he or she can see better than 20/40.

We are often limited in our ability to adequately comprehend what a patient describes as decreased, blurry, or poor vision, because we can only test isolated components of visual function like Snellen acuity, contrast sensitivity, glare, color vision, and visual field. These tests give us incomplete information about a patient's visual performance. For example, a patient may see 20/20 in each eye, but complain that while the vision in one eye is sharp and crisp, the

vision in the fellow eye is blurred. It can be difficult to determine the visual significance of such a cataract since our tests do not enable us to accurately understand the quality of the patient's sight.

Visual acuity is tested monocularly with high contrast (i.e., black letters on a white background). While this is the standard method of assessing vision, it is quite artificial and is not representative of real world conditions. Contrast sensitivity testing is more realistic but less commonly measured. Contrast sensitivity evaluates the ability to differentiate between an object and its background using low contrast letters or sine-wave gratings with different spatial frequencies. Whenever visual acuity is decreased, so is contrast sensitivity, but sometimes contrast sensitivity can be affected significantly more than visual acuity. Therefore, to better assess a patient's visual difficulty, contrast sensitivity should be tested when the visual acuity is better than expected based on the patient's complaints.

Another helpful measurement is glare testing. This is often performed with a brightness acuity test (BAT) to simulate glare from a light source. Patients with cataracts may have good distance visual acuity in a dim room, but experience a significant reduction in acuity from a bright light. This is the characteristic situation with a central posterior subcapsular cataract that scatters light and blocks the entrance pupil when the pupil constricts.

Other tests can be performed to assess the visual potential in a cataract patient with coexisting ocular pathology or to rule out macular or optic nerve pathology when the cataract interferes with a clear view of the posterior pole. The potential acuity meter (PAM) test projects an eye chart directly onto the retina through lens opacities. This is often useful in estimating how much the cataract is contributing to the patient's visual loss. Alternatively, color vision can be used to assess the optic nerve and macula. Color vision testing is a sensitive indicator of optic nerve function and can be tested quickly with Ishihara pseudoisochromatic or Hardy-Rand-Rittler plates. In addition, gross macular function can be evaluated with red perception by asking the patient to identify the color of a red eye drop cap. Optical coherence tomography (OCT) is probably the most helpful test for diagnosing macular pathology, especially subtle findings and when a premium IOL implant is being considered. Visual field testing is also helpful since it will identify scotomas from suspected retinal or optic nerve pathology. The presence of

generalized depression in an otherwise normal field test is characteristic of a significant cataract. Finally, we should not forget the basics: pupil testing is performed in all patients with decreased vision because the presence of a relative afferent pupillary defect indicates optic nerve or widespread retinal dysfunction.

Therefore, although we usually diagnose a visually significant cataract from the patient's symptoms, the Snellen acuity, and the presence of a cataract on slit-lamp examination, there are a variety of other tests at our disposable. These are particularly helpful when the visual acuity is better than expected, the acuity does not correlate with the severity of the patient's visual complaints, or there is other ocular pathology that may be contributing to the reduced vision.

Cataract surgery can be performed along with glaucoma procedures, both invasive and non-invasive.

CONCLUSIONS:

As discussed above, the decision to perform cataract surgery on a patient with glaucoma relies on several factors.  Of primary concern is the determination of how much the cataract is affecting the vision; if it shows not to be vision threatening it would be better to avoid cataract surgery and concentrate on continued care of the glaucoma. Cataract surgery cannot be relied upon to lower intraocular pressure after a certain period of time post cataract surgery. It should not be used for that purpose.  In general, cataract surgery in a patient with glaucoma should be reserved for patients in whom the cataract is causing significant visual disability.

The doctors did not fall below the standard of care with regard to NOT performing cataract surgery on this patient.  The combination of minimal cataract, minimal visual disturbance and no evidence of glare testing all mitigate against the need for cataract surgery in this patient. This is confirmed by the exam of July 13, 2018; Dr. Papendick found no compelling reason to perform cataract surgery on this patient; this is reiterated on the exam of September 6, 2018.

I hold these opinions to the highest degree of medical probability.

I reserve the right to amend this report should further information become available.

Todd A Lefkowitz MD
Sonoran Desert Vision Consulting
August 11, 2021

▮▮▮▮▮▮▮▮▮▮, Phoenix, AZ ▮▮▮▮   602.541.1599
TALEFKOWITZMD@GMAIL.COM